**COMPAGNIE DES BAUXITES DE GUINEE, a corporation**

**v.**

**INSURANCE COMPANY OF NORTH AMERICA.**

**Appeal of COMPAGNIE DES BAUXITES DE GUINEE.**

**No. 82–5583.**

United States Court of Appeals, Third Circuit.

Argued Sept. 12, 1983.

Decided Nov. 10, 1983.

Rehearing and Rehearing En Banc Denied Dec. 12, 1983.

Cloyd R. Mellott (argued), Robert W. Doty, Andrew M. Roman, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellant.

Randall J. McConnell, Jr. (argued), Stephen R. Mlinac, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for appellee.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Compagnie des Bauxites de Guinee (CBG) appeals from a judgment against Insurance Company of North America (INA) for $72,273 in its suit on an insurance policy. CBG contends that the judgment should have been no less than $5,732,402, and seeks a new trial. We conclude that the jury's verdict on which the judgment was entered is supported by evidence in the record and

that no trial errors warrant the granting of a new trial. Thus we affirm.

## I.

CBG, a Delaware corporation, has its principal place of business in the Republic of Guinea, where it mines, processes, and ships bauxite ore. The CBG mine is in the interior of the country, about 85 miles from its processing and shiploading facility on the West Coast of Africa at Kamsar. Connecting the mine and the Kamsar facilities is a railroad operated by CBG over which ore cars transport the ore to a crusher house in which the ore is crushed. After crushing, the ore is kiln dried, and stored in sheds to await shipment. Shipment is by ocean vessels which deliver the ore to aluminum producers in the United States, Canada, France, West Germany and Italy. Those shipments are made pursuant to long term contracts.

On July 17, 1974 one CBG train enroute from the mine to Kamsar collided head-on with another CBG train returning empty. Two locomotives and 30 ore cars were destroyed, seven other ore cars were damaged, and 800 feet of railroad track were destroyed. As a result of the collision all rail traffic was stopped for several days while the wreckage was cleared and a temporary by-pass track laid around the site.

INA is a Pennsylvania corporation which issues casualty insurance. On February 2, 1974, INA issued to CBG a policy insuring against "loss resulting directly from necessary interruption of business caused by damage to or destruction of real or personal property...." When notified of the loss INA admitted that the destruction of the locomotives, ore cars, and track were perils falling within the insuring clause of the policy. The policy requires that the insured render a signed and sworn proof of the loss sustained. Because there were other casualties at Kamsar at about the same time that were unrelated to the train wreck, CBG apparently was unable to prepare a proof of loss within 60 days, and INA granted several extensions of the 60 day policy deadline. A proof of loss was finally submitted in March of 1975, claiming $2,654,682.81. INA, while acknowledging that the loss was covered, informed CBG that the proof of loss did not conform to the requirements of the policy. Fruitless negotiations followed, and CBG filed suit in December, 1975.

## II.

As noted above, the policy insures against "loss resulting directly from necessary interruption of business caused by damage to or destruction of real or personal property ... by the peril(s) insured against." It provides, further, that "[i]n the event of such damage or destruction this Company shall be liable for the ACTUAL LOSS SUSTAINED by the Insured resulting directly from such interruption of business...." That undertaking is qualified, however, by the provision that "[i]t is a condition of this insurance that if the Insured could reduce the loss resulting from interruption of business, ... by making use of stock (raw, in process or finished) at the location(s) described herein or elsewhere, such reduction shall be taken into account in arriving at the amount of loss hereunder." Finally, the policy provides for additional coverage for "such expenses as are necessarily incurred for the purpose of reducing loss under this policy...."

At the trial the parties stipulated that CBG expended $72,273 in reducing the losses resulting from the train collision, and the court directed the entry of a verdict for this sum. It is not in dispute on this appeal. What is in dispute is claimed losses resulting from interference with bauxite production allegedly caused by the interruption of rail service. CBG stipulated at trial that new ore cars received around November 15, 1974 would be considered replacements for those destroyed or damaged in the collision, and thus that the period of recovery for business interruption would terminate as of that date. Thus the trial involved establishment of losses due to business interruption caused by the destruction of locomotives, ore cars and track, between July 17 and mid-November, 1974. INA took the

position that no loss of bauxite production occurred during that period as a result of the destruction of the locomotives, ore cars and track, but that CBG was attempting to attribute to their destruction production losses that actually resulted from other causes. INA also took the position that in any event the inventory of processed bauxite in storage during the relevant period sufficed to meet CBG's contractual obligations for shipments, and must be taken into account in arriving at the amount of the loss. Extensive conflicting evidence was presented on both issues.

Both contested issues were given to the jury in the form of special interrogatories as follows:

2. Did CBG experience a loss in production sometime during the period between July 24, 1974 and November 17, 1974, which was directly caused by the July 17, 1974 train collision?

YES————————NO——————

ANSWER QUESTION 3 *ONLY IF* YOUR ANSWER TO QUESTION 2 WAS *YES.* IF YOUR ANSWER TO QUESTION 2 IS NO, PROCEED TO QUESTION 5, ENTER "NONE" ON LINE 5A, AND ENTER THE AMOUNT OF $72,273 ON LINE 5B.

3. Did CBG experience a loss in shipments as a direct result of the lost production due to the July 17, 1974 train collision, after taking into account CBG's inventory available for shipment?

YES————————NO——————

ANSWER QUESTION 4 *ONLY IF* YOUR ANSWER TO QUESTION 3 WAS *YES.* IF YOUR ANSWER TO QUESTION 3 IS NO, PROCEED TO QUESTION 5, ENTER "NONE" ON LINE 5A, AND ENTER THE AMOUNT OF $72,273 ON LINE 5B.

1. After the notice of appeal was filed the trial court filed an opinion explaining several rulings made during the course of the trial. *Compagnie des Bauxites de Guinee v. Insurance Co.,* 551 F.Supp. 1239 (W.D.Pa.1982).

2. Now any interruption of the plaintiff's business and [sic] any time relevant to this case which occurred as a result of anything other than the damage to or destruction of the real or personal property caused by the July 17, 1974 train collision is not a recoverable loss under the contract of insurance and should not be considered by you in computing the actual loss

The jury answered special interrogatory 2 affirmatively and special interrogatory 3 negatively. Following the court's instructions, it proceeded to answer interrogatory 5:

5. Enter the actual loss sustained, which is Line 4D, above. Enter the amount set forth in the answer to Interrogatory 1. Add these amounts and enter the total on Line C.

$ None
$ 72,273
$ 72,273

Thus the jury found that some loss of production had occurred between July 17 and mid-November as a result of the destruction of the locomotives, ore cars and track, but that no loss in shipments was suffered, because CBG's inventory sufficed to meet its contracts for shipments. Judgment was entered on the verdict for $72,273. No post-trial motions were made.[1] On September 20, 1982 CBG, filed a timely notice of appeal.

### III.

In this court CBG urges that the court erred in its instructions respecting the causal connection between the train collision and the business interruption, in its rulings and instructions on use of inventory, and in admitting and excluding certain evidence. Thus, CBG urges, it is entitled to a new trial.

### A.

*The Instructions on Causal Connection*

The court's charge on causation is quoted in the margin.[2] CBG contends that it is incorrect in several respects. It contends

sustained, if any, as a result of the July 17, 1974 train collision.

So the only destruction or loss that you are to consider has to do with the loss of cars, the loss of the locomotives, and the damage done to the trackage, that is, the tracks that the railroad ran on, at the time and place in question when the accident happened on July 17, 1974.

Now the contract of insurance does not provide coverage for an interruption of a business or interruption of business loss unless that interruption results directly from damage to or destruction of the real or personal property

that the court should have given its requested instruction on concurring causes, that the court erred in instructing that the business interruption must have resulted *directly* from damage or destruction of real or personal property; that the court erred in placing the burden of proof on the policyholder; and that the court erred in charging that CBG cannot recover for business interruption losses caused by a lack of locomotive operators.

CBG's theory of the case was that the train collision resulted in loss of production, which in turn resulted in reduced shipments. The charge on causation was relevant only to the question whether a loss in production occurred. The jury's verdict on that issue is in CBG's favor. Thus we are at a loss to comprehend why any of the claimed errors could be other than harmless. *See* Fed.R.Civ.P. 61. Obviously the jury found a causal relationship between the train collision and the production losses. Thus it must have disregarded other causes urged by INA; must have found that the lost production resulted *directly* from the destruction of the locomotives, ore cars and track; must have been satisfied that if the burden was on CBG it was met; and must have disregarded INA's contention that any production losses were the result of a lack of locomotive operators.

▆▆▆ Although its position is not entirely clear, CBG seems to be urging that despite the fact that it prevailed on the loss of production issue, it should nevertheless be free to urge errors in the charge respecting that issue, because those errors might have had some sort of spillover effect on the inventory issue which was decided against it. Its theory is that the jury could answer the special verdict interrogatory affirmatively, while assuming that only part of the lost production was caused by the physical destruction resulting from the train wreck. CBG did not, however, request a special verdict on the amount of lost production. The court instructed the jury to consider the lost production and lost shipment questions separately, deciding first whether a loss in production resulted from the train collision, and only then proceeding to the inventory issue. The special verdict interrogatories and the jury's answers establish that the court's instructions were followed. It would be entirely speculative to conclude that the court's instructions on the cause of lost production had any effect on the jury's conclusion about the amount of inventory available for shipment, in the absence of a verdict answer specifying the amount of lost production.

In any event, we have examined the charge, and find it to be entirely consistent with the language of the insurance policy.[3] The company agreed to pay loss sustained "resulting *directly* from *such* interruption

---

that I have mentioned, that is, in this case, the two locomotives, cars that were damaged, and the tracks that were damaged and had to be replaced.

So under the facts of this case, interruption of business must result directly from damage to or the destruction of the locomotives, the ore cars, the railroad trackage involved in the July 17, 1974 train collision.

Now if you find that any interruption in plaintiff CBG's business resulted directly from lack of training of qualified locomotive operators, you are instructed that no damage may be recovered from the defendant INA for such an interruption of business.

Now if you find, on the other hand, that the plaintiff CBG observed cautionary safety restrictions immediately after the July 17, 1974 railroad collision, you may find that the business interruption losses, if any, resulting directly from the imposition of these additional safety restrictions were directly caused by the collision.

In other words, we are saying to you that if, in order to be safe and prudent, they did slow down the trains, as it was testified to, to make sure that the trains in the future would run safely and properly, and that the slowdown caused a loss of production, that would be covered by the policy.

But the lack of engineers or other personnel is not a cause that is covered under the terms of this policy of insurance.

Now these things I am telling you now you must accept as true. That's the true interpretation of the loss.

3. Chief Judge Seitz agrees that the judgment of the district court should be affirmed, but he believes that the district judge's instructions that only direct causes could be considered and that losses resulting from a shortage of train operators *must be excluded were erroneous*. However, he believes that these errors did not lead to a result inconsistent with substantial justice. *Cf.* Fed.R.Civ.P. 61.

of business," not loss sustained from other causes. *Such* interruption is interruption "caused by damage to or destruction of real and personal property," not interruption caused by the unavailability of locomotive engineers. And since the policy required that the insured submit a proof of loss, and CBG was the plaintiff in a contract action, placing on it the burden of establishing its loss was not error.

## B.

### *The Instruction on Use of Inventory*

CBG makes two objections to the court's charge on the use of inventory issue.

The first is that fairly construed it amounted to an instruction that CBG must exhaust its inventory unconditionally and almost completely before it can recover on the policy. A proper instruction, CBG contends, would require good faith use of inventory in a commercially reasonable manner. The second is that the burden of persuasion should have been placed on INA on the inventory issue.

■ The court's initial charge on use of inventory is quoted in the margin.[4] After considering CBG's objections the court gave

---

4. The general provisions of the policy or contract provide that the insured company reduce the loss and should reduce a loss resulting from the interruption of its business caused by the train collision by completely or partially resuming operations or by making use of stock or inventory; and this reduction of loss must be taken in account in arriving at the amount of loss, if any.

. . . .

If you determine that there is a loss of production attributable to the railroad collision, you must make a further calculation as required by the policy of insurance. That is, if you determine there is a loss of production attributable to the railroad collision, you must next consider whether there has been a corresponding loss in sales.

Now you do this by comparing actual shipments with planned shipments and determining whether there has been a loss of shipments directly attributable to the train collision.

However, you must also look to the inventory or stockpiles of CBG during the relevant period of time.

If there was sufficient available inventory on hand to meet planned shipments that the plaintiff could have used, even if CBG did not use these stockpiles, that is, the plaintiff, then there can be no loss.

For example, suppose they normally produced a thousand a month. Let's suppose they did in fact—during the period of the shutdown or partial shutdown due to the train collision, they only produced 500 a month.

If they had 500 tons in the stockpile, you add 500, and since that equals a thousand, there is no loss.

Do you understand what I am trying to say?

So you take available inventory, and if it is sufficient in amount to make up the difference between the lost production and what would be normally produced, then there would be no loss.

On the other hand, if you take inventories into account and you have some production during the shutdown, the partial shutdown period, and still, adding the amount produced during the partial shutdown period and the stockpile or inventory, and it still doesn't equal to the normal production, the difference then would be the amount of compensable loss: and, of course, there has to be a loss, of course, in shipping. That's the real bottom line.

So just to summarize, if there was sufficient available inventory on hand to meet planned shipments which the plaintiff could have used, even if the plaintiff did not use these stockpiles, then there can be no loss in sales.

That is, you must reduce any loss in sales by the amount in inventory actually available for shipment, even if the plaintiff did not make use of that available inventory.

Now, however,—and I want you to take note of this,—you are instructed that the available inventory is to be used in a commercially reasonable manner so as to reduce the loss and in such a manner as to enable the resumption of operations with the same quality of service which existed immediately prior to the train collision.

Now you heard testimony, for example, that maybe with a front end loader they could clean out that storehouse of every pound of inventory.

The question is whether or not that is commercially feasible, in other words, whether it is commercially feasible just to scrape out every pound of inventory just to use it, in the light of the fact that the bucket wheel in its normal operation was not able to scoop out the corners of the storage building, and if the bucket wheel itself were used to load the ore, there would be some inventory that could not be commercially or feasibly used.

Now that's something that was said. Whether you want to believe that or not is up to you, but that gives you sort of an example of the type of thing we are speaking of at this juncture of the charge.

Now if you find that the plaintiff has suffered a loss of production as a direct result of the

a clarifying instruction.[5] Following the clarifying instruction the court inquired of counsel "Is that about it, gentlemen? Is everybody satisfied?" Counsel for CBG re-

railroad accident, as we have indicated, that the plaintiff was unable to completely or partially resume its operation as a result of the railroad collision, that the plaintiff could not have used its available inventory to fulfill shipping requirements, that the plaintiff was therefore unable to meet its shipping requirements, only then has the plaintiff suffered a loss of sales as a direct result of the July 17, 1974 railroad collision which can be the basis of a reduction of gross earnings under the terms and conditions of the contract of insurance.

. . . .

All right. Now 3, did CBG experience a loss in shipments—now this is the real crucial one. Remember, there is a difference in loss of shipments as compared with a loss of production.

Did CBG experience a loss in shipments as a direct result of the lost production due to the July 17, 1974 train collision, after taking into account CBG's inventory available for shipment?

Just like we gave in our illustration, let's suppose production is down by 500 tons a month, but there is 500 tons in inventory. If they use the 500 tons in inventory plus the other 500 that they would produce, they would have the thousand by calling on inventory to make up the difference.

Do you understand what we are saying?

So if the inventory is available, now that's the argument of the defense. The defendant said,

"They lost production, but there was enough inventory on hand so they wouldn't have to lose any shipments."

Do you follow me?

On the other hand, the plaintiff denies that. Plaintiff said that the inventory was used up for all practical purposes and that as a consequence, they lost a number of thousands of tons of shipments because of a direct result of the train collision.

Now that's a question of fact that you are going to have to determine, whether the plaintiff's contention is right or whether the defense contention is right.

Whether there was enough inventory on hand to make up the loss in production or not is something that you are going to have to determine.

5. Now during the course of this charge, we made various illustrations. I used the word, suppose you had a thousand tons of production that were to be sold, and that 500 tons, I said, were produced during the effective period of time, and suppose you had say 500 tons on hand for inventory, that the inventory plus the production during this period of time would equal a thousand or it wouldn't be lost.

I made this example strictly as illustrative. I mean I don't want you to use any examples that I have made as though I am trying to tell you how to decide this case. Please interpret any example I have made in that light.

It is just purely made to try to increase your understanding of a very complex computation that has to be made in a very complex case, as you now I am sure understand.

. . . .

If you determine there is a loss of production attributable to the railroad collision, you must make further calculations as required by the policy of insurance.

That is, if you determine there is a loss of production attributable to the railroad collision, you must next consider whether there has been a corresponding loss in sales, that is, shipping.

You do this by comparing actual shipments in determining whether there has been a loss of shipments directly attributable to the train collision.

However, you must also look to the inventory or stockpiles of CBG—CBG is plaintiff—during the relevant period of time. If there was sufficient available inventory on hand to meet planned shipments which CBG could have used, even if CBG did not use these stockpiles, there can be no loss in sales.

That is, you must reduce any loss in sales by the amount of inventory actually available for shipment, even if CBG did not make use of that available inventory.

And that is what the defendant claimed happened on this [Defendant's] Exhibit 573, that they did use—that inventory either was used or could have been used to ·offset any loss of production.

All right. Now in addition, remember this: You are instructed that available inventory is to be used in a commercially reasonable manner so as to reduce the loss and in such a manner as to enable the resumption of operations with the same quality of service which existed immediately prior to the train collision.

This had to do with some testimony, whether you can believe it or not,—believe it as you see fit,—whether or not they could have gotten a front end loader and swept every pound out and shipped it, was that commercially feasible or not, or maybe because they left a few tons in corners and so on or what not, whether that was proper.

Those are things that you are going to have to consider, but that's what this charge has to do with.

In other words, the plaintiff was obliged to do that in regard to inventory which was commercially reasonable.

Now whatever you think is reasonable under the circumstances and the facts of this case, you may draw on your experiences as mature adults to make a determination. But that is the charge of the court on that.

sponded "I have nothing further other than what I previously stated." App. at 3191a. In light of this colloquy it is not at all clear that the objection to the charge relied on here was actually preserved. Nevertheless we have considered CBG's contention that the charge amounted to an instruction that CBG must exhaust inventory unconditionally before it can recover on the policy. No fair examination of the original and supplemental instructions in their entirety can lead to such a conclusion. Plainly the court charged that the insurance policy imposed on the insured the obligation to reduce business interruption losses by using inventory in a commercially reasonable manner, and left it to the jury to determine both what was commercially reasonable in light of the evidence and whether CBG had so acted. CBG would have us focus on the 500 ton illustration, as if it were a direction that inventory must be reduced to that level. When that strained interpretation of the illustration was called to the court's attention, however, the court made it perfectly clear that the example was strictly illustrative, and should be interpreted in that light. The objection to the charge is without merit.[6]

■ We also find meritless CBG's contention that the burden of persuasion should have been allocated to INA on the inventory issue. Its argument is that mitigation of loss is an affirmative defense. The policy, however, states that if the insured can reduce the loss which might result from a business interruption "such reduction shall be taken into account in arriving at the amount of the loss hereunder." The burden was on the policyholder to establish the amount of the loss. The inventory clause is not a mitigation of damage clause. It goes to computation of loss resulting from business interruption caused by destruction of real or personal property. Loss is defined as "ACTUAL LOSS SUSTAINED by the insured resulting directly from such interruption of business, but not exceeding the

reduction in Gross Earnings . . . ." Thus if there was no interruption of sales—if earnings continued—there was no loss within the terms of the policy. *See Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980) (business interruption insurance generally intended to return to insured amount of profit it would otherwise have earned). INA did not rely on any exclusion of coverage. It admitted coverage, but insisted that the insured prove the amount of its loss. There was no basis on which the court could shift to the insurer the obligation to disprove the amount of the loss. Indeed, allocating the burden of persuasion to the insured is consistent with the well established rule that where the facts lie peculiarly within the knowledge of one party, that party should bear the risk of non-persuasion. Any other rule would be particularly onerous to a party lacking information but required to prove a negative. What was a commercially reasonable use of CBG's bauxite inventory was a matter peculiarly within its knowledge. CBG simply failed to persuade the jury on that hotly contested issue. There is no basis for granting a new trial in which the burden is placed on INA to disprove what in the first trial CBG failed to prove to the satisfaction of the factfinder.

## C.

### The Evidence Rulings

1. Evidence Admitted.

CBG contends that the trial court committed reversible error in admitting the testimony of two expert witnesses, Edmund Burke, a civil engineer, and Gerald Driscoll, a certified public accountant.

■ Mr. Burke testified on that aspect of the case dealing with loss of production. A partner in an engineering firm and the holder of an undergraduate and graduate degree in civil engineering, Burke had broad civil engineering experience prior to

---

**6.** Chief Judge Seitz agrees that the judgment of the district court should be affirmed, but he believes that the district judge's instruction on the use of inventory was erroneous. However, he believes that this error did not lead to a result inconsistent with substantial justice. *Cf.* Fed.R.Civ.P. 61.

his visit to CBG's facilities in Guinea. His opinion as to the cause of loss of production was admissible under Fed.R.Evid. 702 if he was "qualified as an expert by knowledge, skill, experience, training, or education." The trial court found that he was so qualified. This question is relegated, under Fed. R.Evid. 104(a) to the trial court, whose findings on Burke's qualifications are not clearly erroneous. But more fundamentally, even if they were, that would be no ground for reversal in this instance, because CBG prevailed on the issue of the cause of loss of production. Thus even if Burke's testimony had been erroneously admitted the error would be harmless.

Mr. Driscoll, a certified public accountant, testified on the use of inventory issue. He did not, however, opine that all the inventory on hand in the relevant time period should have been shipped. Instead, from CBG's own records, Driscoll compared lost production with available inventory. The contention that a certified public accountant was not qualified to make these simple mathematical comparisons borders on the frivolous.

2. Evidence Excluded

CBG contends that the trial court erred in excluding evidence of its business performance during the period from 1976 through 1981. By that time the damaged facilities resulting from the other accidents at Kamsar had been redesigned and rebuilt. INA objected to the relevancy of the proffered evidence, pointing to the policy language:

> In determining Gross Earnings due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

The evidence establishes that the production facility underwent substantial rebuilding to a new design. That made the tendered evidence of questionable relevance, and suggested the possibility of undue prejudice with respect to the period when the loss allegedly occurred. The court's ruling was well within the discretion accorded to the trial court by Fed.R.Evid. 403. Moreover the trial court conditioned its ruling by giving CBG an opportunity to use the evidence in rebuttal. No rebuttal offer was made.

CBG also contends that the trial court erred in excluding deposition testimony of A.O. White, an insurance adjuster, including references to a report by White to Ralph Carson of American International Group, Inc. about White's investigation of a casualty covered by a Contractor's All Risk policy. The deposition was tendered as relevant to the issue of lost production as a result of the train collision. On that issue White's deposition was of marginal relevance, and plainly cumulative. Thus the court did not abuse its discretion under Rule 403 in excluding it. Moreover, had any abuse of discretion occurred the error would be harmless since CBG prevailed on the lost production issue.

## IV.

None of the grounds relied upon by CBG for setting aside the jury verdict would justify doing so. That being so, CBG's final contention that as a matter of law it was entitled to an award of delay damages, adjustment for inflation or prejudgment interest, is for the most part moot. An insurer cannot be charged with any of those items of damage for withholding payments found by the jury not to be due. Nor would delay in payment of the $72,273 for which the trial court directed a verdict justify the award of such items of damage in this instance. INA's contractual obligation to pay arose only upon presentation of a proper proof of loss. The verdict establishes that the proof of loss seeking $2,654,682.81 was anything but proper. It establishes, as well, that INA was justified in resisting a lawsuit in which CBG attempted to recover $5,732,402.

## V.

The judgment appealed from will, therefore, be affirmed.