PENNBARR CORP.; Kilbarr Corp., Appellants in 91–5607,

v.

INSURANCE COMPANY OF NORTH AMERICA, Appellant in 91–5608.

PENNBARR CORP.; Kilbarr Corp.

v.

INSURANCE COMPANY of NORTH AMERICA,

Pennbarr Corporation and Kilbarr Corporation, formerly Remington Rand Corporation–New Jersey and Remington Rand Corporation–Delaware, Appellants in 91–5642.

Nos. 91–5607, 91–5608 and 91–5642.

United States Court of Appeals, Third Circuit.

Argued Feb. 11, 1992.

Decided Sept. 25, 1992.

Rehearing and Rehearing In Banc Denied Oct. 21, 1992.

Andrew F. Napoli (argued), Manchel, Lundy & Lessin, Philadelphia, Pa., for Pennbarr Corp. and Kilbarr Corp.

Michael J. Izzo, Jr. (argued), Cozen & O'Connor, Philadelphia, Pa., for Insurance Co. of North America.

Before: BECKER, ROTH, and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge:

This appeal requires us to interpret the indemnity period of a business interruption insurance policy. Appellees, Remington Rand Corporation, Delaware, and its wholly owned subsidiary Remington Rand Corporation, New Jersey, (collectively "Remington")[1] brought suit against appellant, the Insurance Company of North America ("INA"), for recovery of lost profits and royalties allegedly due and owing under a business interruption insurance policy procured from INA in December of 1979. The case was tried before a jury, and a verdict was rendered in favor of Remington. INA appeals the district court's denial of its pretrial motion for summary judgment, arguing that as a matter of law Remington's alleged lost profits were not covered under the clear policy language.[2] We agree and

---

1. In June of 1991 the caption of this case was amended to rename plaintiffs/appellees Pennbarr Corporation and Kilbarr Corporation. In the interest of clarity we will continue to refer to plaintiffs/appellees as "Remington."

2. INA also appeals the district court's denial of its motion for a directed verdict and several alleged trial errors. Because we conclude that INA's motion for summary judgment should have been granted, we do not reach these additional claims.

will reverse the district court's summary judgment decision.

## I.

During 1980 and 1981 Remington Rand New Jersey was in the business of selling electromechanical typewriters, under the Remington Rand logo, to a network of dealers, government entities, and other customers. Remington Rand Delaware, as the parent company, collected royalties on the sale and production of these typewriters. The Remington companies also included two wholly owned subsidiaries: Remington Rand Business Systems B.V., in DenBosch, Holland, and Remington Systems Italiana, S.P.A., in Naples, Italy. All typewriters sold by Remington New Jersey were manufactured at these two sites: the Naples plant produced virtually all typewriters sold in Remington's North American market, while the DenBosch plant produced typewriters for sale in Remington's other markets.

The business interruption insurance policy at issue in this case was negotiated with INA on Remington's behalf by Remington's broker and insurance consultant. The parties agree that the goal of these negotiations was to create an insurance program covering all of the related Remington companies, including the Italian and Dutch subsidiaries. The negotiations culminated in Remington's purchase of a policy of business interruption insurance from INA for a one-year period ending December 1, 1980, with a liability limit of two million dollars. This policy was later renewed for one additional year, with an increased liability limit of six million dollars.

The relevant terms of that policy are as follows:

### II. *COVERAGE*

1. Subject to all of its provisions and stipulations, this policy covers only against loss resulting directly from necessary interruption of business conducted by/or through the insureds' U.S. sales operations caused by damage to or destruction of any of the real or personal property (including finished stock) hereinafter described and referred to as contributing properties (and/or arising out of inability of one contributing property to produce due to destruction/damage/loss to or at another contributing property) by the perils insured against by the terms of this policy which wholly or partially prevents the delivery of materials (including finished stock) to the insured or to others for the account of the insured and results directly in the necessary interruption of the insureds' business.

2. The Company shall be liable for the ACTUAL LOSS SUSTAINED by the Insured resulting directly from such interruption of business, but not exceeding the reduction of Gross Earnings less charges and expenses which do not necessarily continue during the interruption of business, *for only such time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such contributing properties as has been damaged or destroyed, commencing with the dates of such interruption of the Insured's business and not limited by the expiration date of this policy.* Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

. . . . .

### IV. *RESUMPTION OF OPERATIONS*

It is a condition of this insurance that if the Insured could reduce the loss resulting from the interruption of business,

1. by complete or partial resumption of operations of the contributing operations or U.S. operations of the insured,

2. by making use of stock (raw, in process or finished) of contributing properties or of U.S. operations of the insured,

3. by making use of any other available source of materials,

such reduction shall be taken into account in arriving at the amount of loss hereunder.

(emphasis added). Both foreign subsidiaries are listed in the policy as contributing properties. Though one policy was initially contemplated to provide business interruption insurance for all Remington properties, it was necessary in order to comply with foreign law to draft separate policies for the foreign subsidiaries. Separate policies issued to the Italian and Dutch subsidiaries provided property and business interruption coverage identical to that in the United States. This case, however, does not involve any claim for reimbursement under these separate policies.

Remington's business interruption claim arose out of damage caused by two earthquakes that struck Naples, Italy, in November of 1980 and January of 1981.[3] First, on November 23, 1980, an earthquake damaged Remington's Naples subsidiary. Though the parties dispute the extent of damage, they agree that typewriter production ceased for five working days. After the Naples facility resumed manufacturing on December 2, 1980, production continued through January 9, 1981, when a second earthquake again stopped operations. Repairs to the plant were completed, and production resumed, on February 17, 1981.

On March 25, 1981, the Naples subsidiary was closed as a result of an Italian bankruptcy proceeding that was not related in any way to the earthquakes. As a consequence, Remington lost all control over, and received no more typewriters from, its Italian plant. Almost concurrently, Remington's Holland plant went into bankruptcy and ceased shipping typewriters. Remington's United States companies also filed for bankruptcy under Chapter 11 of the Bankruptcy Code. After the bankruptcy of its European subsidiaries, Remington was not able to locate alternative typewriter production facilities. As a result, the company went into a passive marketing mode in an effort to stretch its inventory until it could switch to an alternative product. Remington, however, was able to acquire approximately 14,500 typewriters from an outside source between September and November of 1981. The company reorganized in December of that year and changed its product to an electronic typewriter.

Remington subsequently filed a claim under its business interruption insurance policy for the recovery of lost profits and royalties suffered as a consequence of the two Italian earthquakes. In calculating its damages, Remington claimed a loss of sales equal to the production lost as a consequence of the earthquakes, approximately 14,900 typewriters. However, the claim did not allege that the loss was incurred during the actual period that its Naples subsidiary was inoperative as a result of earthquake damage. Instead, Remington asserted that its loss occurred during any three-month period between May of 1981 and June of 1982: according to Remington, it could have sold the 14,900 typewriters that were not produced because of the earthquakes at any point during that period because by that time its inventory was depleted and it could not meet its ordinary sales obligations.[4] INA denied coverage of these losses under the business interruption policy on the grounds that only losses incurred simultaneously with an interruption of business came within the clear language of the policy's indemnity period.

On November 20, 1981, Remington instituted an action against INA in the United States Bankruptcy Court for the District of New Jersey, seeking recovery under the business interruption insurance policy of earnings and royalties allegedly lost as a result of the earthquakes. Remington

---

**3.** Both parties agree that earthquakes are insured perils under the policy.

**4.** Remington stipulated that in November of 1980 it had 32,500 typewriters in its United States inventory ready for sale. During that month, despite the first earthquake, Remington satisfied its ordinary sales obligations, selling 5,400 typewriters. Inventory increased to 34,000 typewriters in December, 35,052 in January, and dipped only slightly to 28,334 in February of that year. Between March and June of 1981 Remington's inventory decreased from 27,364 to 11,814 typewriters.

claimed that it was entitled to recovery of these amounts under the terms and conditions of the policy. The case was assigned to the United States District Court for the District of New Jersey on September 29, 1984.

INA moved for summary judgment in April of 1986, arguing that, as a matter of law, under the clear language of the policy Remington could not recover the losses it claimed because they fell outside of the policy's indemnity period. The district court denied INA's motion, reasoning that there was a material issue of fact for trial because the language establishing the indemnity period was ambiguous. The court anchored this finding of ambiguity on what it deemed the unique nature of Remington's typewriter business: a long production pipeline and shipping time which resulted in a significant lag time between production and sales and necessitated the maintenance of a substantial inventory. Because Remington's business was the sale of typewriters, the court agreed with Remington that it was possible to read the policy's phrase "interruption of the Insured's business" as meaning "interruption of the sale of typewriters." This alternative interpretation rendered the indemnity period of the policy capable of more than one meaning: it could be construed as beginning when Remington's typewriter sales were interrupted, rather than, as INA argued, at the point of the interruption of the supply of the contributing plants, and then extending for a period equivalent to the period that the contributing property was inoperative due to the insured peril.

The district court also distinguished other cases that had found the indemnity period of similarly-worded business interruption insurance policies unambiguous. These cases, according to the court, did not involve an "interdependent business" with its accompanying lag-time between production and sales and so did not raise similar questions regarding the insurance policies' indemnity period.

The case was subsequently tried before a jury from January 8 to February 19, 1991. The jury concluded that Remington's loss was covered by the insurance policy and rendered a verdict in favor of Remington, awarding $1,579,185 in lost profits and royalties. On March 8, 1991, Remington moved the district court to add pre-judgment interest to that award. The court granted this motion in certain respects and on June 24, 1991, entered a judgment in the amount of $1,980,430 in favor of Remington.

INA appeals the district court's summary judgment decision as well as several issues related to the trial of this case. Remington filed a cross-appeal, contesting the district court's decision to limit its prejudgment interest award in certain respects. The district court had subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $50,000. We have jurisdiction to review the final judgments of the district court pursuant to 28 U.S.C. § 1291.

II.

In reviewing a denial of a motion for summary judgment, we apply the same standard that should have been applied by the district court. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). We will reverse the decision to deny such a motion only if we find it plain that there is no genuine issue of material fact for trial. Our review of this question is plenary. *See American Medical Imaging Corp. v. St. Paul Fire & Marine Ins. Co.*, 949 F.2d 690, 692 (3d Cir.1991).

 Specifically with regard to a denial of summary judgment on an issue of contract interpretation, to reverse the district court we must conclude that the contract is so clear it can only be read one way. This question of whether contract terms are clear or ambiguous is one of law, *International Union, United Auto. v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). Therefore, it is the task of the court to make a preliminary determination as to whether an ambiguity exists. *Tigg Corp.*, 822 F.2d at 362–63. The burden is on the moving party

to produce credible evidence that would entitle it to a directed verdict if not controverted at trial. If the movant makes such an affirmative showing, the burden shifts to the opposing party to demonstrate the existence of a genuine issue of material fact for trial. *Id.* at 362 (citations omitted). "If the non-moving party presents us with a reasonable reading of the contract ... then a question of fact as to the meaning of the contract exists which can only be resolved at trial." *Id.* at 361 (quoting *Landtect Corp. v. State Mut. Life Assur. Co.*, 605 F.2d 75, 79 (3d Cir.1979)).

Thus we will reverse the district court's denial of INA's summary judgment motion only if, viewing the evidence tendered in the light most favorable to Remington, we conclude that as a matter of law the losses Remington claimed were not compensable under the clear language of the policy. *See Tigg Corp.*, 822 F.2d at 361. The central question in this case is whether the district court correctly concluded that the business interruption policy's indemnity period, the period within which a loss must occur for there to be coverage under the policy, is ambiguous.[5] If we agree with the district court that Remington does advance a reasonable alternative interpretation of the insurance policy's indemnity period, one that provides coverage for the production lost as a consequence of the earthquakes, summary judgment was properly denied and the case properly proceeded to trial. Alternatively, if we cannot deem reasonable Remington's suggested interpretation of the policy, as a matter of law the contract is not ambiguous and we must enforce it as written to determine whether under its clear terms Remington's losses came within the scope of the policy's coverage.

INA's argument that the district court erred in adjudging the contract language ambiguous, and so improperly denied its motion for summary judgment, is grounded on the contention that the alternative construction of the indemnity period advanced by Remington in support of coverage under the policy is not reasonable.[6] According to INA, this construction is both at variance with the express language of the policy and renders other provisions of the insurance contract meaningless.

Specifically, INA explains that the policy insured against losses caused by interrupted supply resulting from damage to a contributing property by an insured peril. The policy's phrase "interruption of business" is not synonymous with interruption of the insured's sales, as Remington argues, but instead means such interruption of supply. Therefore, in INA's view, under the clear language of the policy the indemnity period begins on the date that the contributing property is damaged and has an outside limit of the length of time required, with the exercise of due diligence and dispatch, to rebuild, repair, or replace such property.[7] Losses that occur after the date that the contributing property resumes operation are not covered; the policy only covers losses of sales that occur *simultaneously* with interruption of manufacturing activity. In this case the business interruption was the interruption, as a result of the earthquakes, in the supply of typewriters produced by the Italian subsidiary. Because Remington admitted that it experi-

---

5. At the November 21, 1986, summary judgment hearing before the district court, counsel for Remington admitted that if the indemnity period is interpreted as INA argues, there is no other issue of material fact for trial.

6. INA also argues that the district court's conclusion that there was a "lag time" between production and sales in Remington's business was based on unsworn *factual statements* made in Remington's brief in opposition to summary judgment, directly controverting Federal Rule of Civil Procedure 56(e). As a result of our holding in this case, we do not find it necessary to address this contention.

7. The indemnity period states that INA shall be liable for the actual loss sustained by Remington resulting directly from an interruption of business, "for only such time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such contributing properties as has been damaged or destroyed, commencing with the dates of such interruption of the Insured's business and not limited by the expiration date of this policy." *See* Section II.2 of the policy, p. 147 (Typescript at 3).

enced no losses until May of 1981, several months after the Naples plant resumed production, INA argues that these losses were not covered under the policy.

Further, INA emphasizes that the policy's resumption of operations clause required Remington to reduce any business interruption loss by making use of existing inventory or obtaining inventory from alternative sources. Pursuant to this clause, if Remington is able to satisfy its sale obligations while the contributing property is inoperative through the use of such inventory, there is no actual loss within the indemnity period and no recovery may be had under the policy. However, INA explains, Remington did not fulfill these requirements of the resumption of operations clause. Indeed, Remington's interpretation of the indemnity period reads the requirements of that clause out of the policy. Consequently, INA argues, Remington's alternative interpretation of the policy cannot be deemed reasonable, and it was entitled to summary judgment as a matter of law.

■ We are guided in our task of interpreting this business interruption insurance policy by the principle that "a policy of insurance is simply a contract and its provisions should, of course, be construed as in any other contract." *Caruso v. John Hancock Mut. Life Ins. Co.*, 136 N.J.L. 597, 57 A.2d 359, 360 (1948).[8] A contract is ambiguous if it is susceptible of more than one meaning. *Tigg Corp.*, 822 F.2d at 362. However, a "court should not torture the language of [a] policy to create ambiguity." *Stiefel v. Bayly, Martin & Fay, Inc.*, 242 N.J.Super. 643, 577 A.2d 1303, 1308 (1990). An insurance policy cannot be rewritten by the court and is not ambiguous merely because it is complex. *Transamerica Ins. Co. v. Keown*, 451 F.Supp 397, 400 (D.N.J. 1978) (stating New Jersey law).

■ To discern whether the policy is ambiguous, we must "consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence

offered in support of those meanings." *Mack Trucks*, 917 F.2d at 111 (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986)). *See also Ace Stone, Inc. v. Wayne*, 47 N.J. 431, 439, 221 A.2d 515, 520–21 (1966). Our goal is to decide whether "there [are] objective indicia that, from the linguistic standpoint of the parties, the terms of the contract are susceptible of different meanings." *Mack Trucks*, 917 F.2d at 111 (quoting *Mellon Bank N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980)). Genuine ambiguity exists only "where the phrasing of the policy is so confusing the average policy holder cannot make out the boundaries of the coverage." *American White Cross Lab., Inc. v. Continental Ins. Co.*, 202 N.J.Super. 372, 495 A.2d 152, 157 (1985) (citing *Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 247, 405 A.2d 788, 795 (1979)). Moreover, it is our responsibility "to give effect to the whole policy, not just one part of it." *Arrow Indus. Carriers, Inc. v. Continental Ins. Co.*, 556 A.2d 1310, 1315 (N.J.Super.Ct. Law Div.1989). A construction that gives reasonable meaning to all of the contract's provisions is "preferred to one which leaves a portion of the writing useless or inexplicable." *Caruso*, 136 N.J.L. 597, 57 A.2d at 360. Finally, we may not make a different or better contract than the parties themselves saw fit to enter into. *In re Community Medical Ctr.*, 623 F.2d 864, 866 (3d Cir.1980) (stating New Jersey law). *See also Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 46, 161 A.2d 717, 720 (1960).

■ With these principles of contract interpretation in mind, we turn to the language of Remington's business interruption insurance policy. Our task is to consider the policy in its entirety, in order to determine whether the interpretation of the indemnity period advocated by Remington can be adjudged reasonable. After considering the policy's language and the alternative constructions advanced by the parties,[9]

8. Both parties agree that New Jersey law applies to this case.

9. We do not consider extrinsic evidence, for in rendering its summary judgment opinion the district court stated that neither party had pro-

we agree with INA that as a matter of law the contract is not ambiguous and that under its plain language INA's motion for summary judgment should have been granted. Specifically, under the interpretation of the indemnity period advanced by Remington as evidence of ambiguity, it is impossible to give effect to the entire policy: this interpretation both vitiates the policy's resumption of operations clause and eliminates any outside time limit for the bringing of a claim of loss under the policy.[10]

■ The resumption of operations clause explicitly states that, if the insured can reduce the loss resulting from an interruption of business by making up lost production through the use of other production facilities, existing inventory, or other sources of supply, "such reduction *shall* be taken into account in arriving at the amount of loss" under the policy. (emphasis added). This clause conditions recovery under the policy on the insured's reduction of its losses to the extent possible through the use of available inventory. It is not a mitigation of damages clause, but instead is a condition of the policy's coverage. *See Compagnie des Bauxites De Guinee v. Insurance Co. of N. Am.*, 721 F.2d 109, 116 (3d Cir.1983) (construing identical clause). It goes directly to the computation of loss resulting from business interruption caused by the damage of a contributing property. *Id. Accord Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531, 534 (8th Cir. 1966).

Remington maintains that, in accord with its reading of the indemnity period, it used and accounted for its existing inventory in compliance with this clause through continuing to sell typewriters until it lacked sufficient inventory to meet sales requirements. At that point, in Remington's view, it experienced an interruption of sales, the indemnity period began to run, and its ex-

isting inventory was insufficient to reduce its loss to any degree.

We cannot agree that the selling-off of inventory prior to an interruption of business, as Remington defines that phrase, is a meaningful implementation of the resumption of operations clause's mandate that existing inventory be used to reduce the insured's business interruption loss. In fact, under Remington's interpretation of the indemnity period it is impossible to imagine a scenario in which the insured would be able to utilize existing inventory to reduce this loss. In each instance there could be no interruption of business until inventory is depleted to such an extent that sales obligations can no longer be met. Reduction of loss from an insured peril through the use of inventory would be impossible, for under Remington's definition of an interruption of business, there could never be sufficient inventory remaining at the point of interruption to be employed in reducing loss since the obligation to use inventory would never kick in until inventory had been exhausted. Remington's interpretation of the indemnity period thus effectively eviscerates this condition of insurance under the policy.

The resumption of operations clause also requires the insured, if possible, to use supplemental inventory acquired from alternative sources of supply to reduce a business interruption loss, and to account for this supplemental inventory when calculating its loss under the policy. Remington, however, asserts that in calculating its loss it did not have to account for the 14,500 typewriters it received from an outside source between September and November of 1981. In Remington's view, because its inventory was insufficient to meet its sale obligations as of May, 1981, more than three months before it acquired these typewriters, by the time of that acquisition it already would have sold the production lost due to earthquake damage. Consequently, it was not required to account for

duced any extrinsic evidence to clarify the appropriate interpretation of the contract.

**10.** We note that in denying INA's motion for summary judgment, the district court did not

broach the question of whether under Remington's alternative construction it was possible to give effect to all provisions of the insurance policy.

this acquisition in calculating its loss under the policy, because these additional typewriters did not reduce that loss.

We find that this argument, too, reads the conditions of insurance expressed in the resumption of operations clause out of the policy. If, as Remington asserts, there is no business interruption until there is an interruption of sales, an insured routinely could avoid accounting for inventory acquired from outside sources in calculating its loss under the policy. Simply, the insured could assert that because it has experienced an interruption in sales due to insufficient inventory, the lost production already could have been sold, and thus the loss under the policy already was incurred, before it acquired additional inventory from outside sources in an effort to meet its sales obligations. Thus the alternative interpretation of the indemnity period advocated by Remington and endorsed as reasonable by the district court provides Remington with a means of skirting this condition of the insurance, and the resumption of operations clause is left a virtual nullity. The principles articulated by the New Jersey courts for discerning whether contracts are ambiguous do not sanction such an emasculation of the clear language of a contract in an attempt to discover ambiguity. *See Stiefel,* 577 A.2d at 1307–08.

It is of particular note that Remington, in an effort to establish the fact that it was able to comply with the resumption of operations clause under its interpretation of the indemnity period, argues that it would have sold the production lost due to the earthquakes prior to September of 1981, the date it began to acquire typewriters from the outside source. At the same time, as will be discussed below, in an attempt to articulate some circumscribed time period in which it experienced the business interruption loss, Remington asserts that it could have sold its lost production during *any* three-month period between May of 1981 and June of 1982. This sort of con-

trived interpretation of the terms and requirements of the insurance policy cannot be deemed reasonable. Thus Remington's attempts to breathe life into the resumption of operations clause under its alternative construction of the policy fail.

Remington's interpretation of the indemnity period also eliminates any outside time limit for the bringing of a claim of loss under the policy. Under this interpretation, at any point following a period in which a contributing property is inoperative due to an insured peril, the insured could deplete its inventory and bring a claim for interruption of business. For example, if at the time of the second earthquake Remington had sufficient inventory on hand to meet its sales obligations through February of 1983, Remington could have utilized this inventory to meet its sales requirements through that date, and then brought a claim for business interruption, alleging lost earnings due to the earthquakes, a full year after production was resumed at the Italian plant. Indeed, once an interruption of business is equated with an interruption of sales, if Remington's supply of typewriters were restricted at any time for any reason, whether or not by the occurrence of another insured peril, Remington could have sold its existing inventory and then brought a claim under the policy for interruption of business as the result of the November 1980, and January 1981, earthquake damage.[11] Absent clear language manifesting this intent, we cannot deem such a result a reasonable interpretation of the policy. Without some cutoff date for the bringing of claims under the policy, "claims would be open to a degree of speculation which would be absurd." *Rogers v. American Ins. Co.,* 338 F.2d 240, 243 (8th Cir.1964) (quoting language from the district court). Were we to find this interpretation reasonable, we would be making a different and better contract for Remington than the parties

11. At oral argument Remington was questioned concerning the point in time when it would have incurred the losses it claimed as a result of the earthquake damage had it not been for the bankruptcy proceedings which stopped its re-

ceipt of typewriters from the two European plants in late March, 1981. Remington's counsel admitted that it was impossible to answer this question without engaging in speculation.

saw fit to enter into, a result explicitly prohibited under New Jersey law.

As evidence of the reasonableness of its construction of the policy, Remington emphasizes the fact that the policy was the product of negotiations conducted by its insurance broker and expert with INA. In Remington's view, policy language produced through such negotiations should not be deemed "standard." Thus while the indemnity period of a typical business interruption policy commences with the date of the insured peril and lasts until the contributing property is restored, under this unique, negotiated policy, that period commences with the date of the interruption of sales. This argument is hinged on what Remington terms the unique character of its business: a European manufacturing plant producing typewriters for sale in the United States. Specifically, Remington argues that, if INA intended the indemnity period to run concurrently with the interruption of supply, INA should have changed the language *"for* only such time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such contributing properties as have been damaged or destroyed, commencing with the dates of such interruption of the Insured's business and not limited by the expiration date of this policy[ ]" to *"during* only such time as would be required . . . ."

This is a distinction without a difference. Numerous courts, often without discussion, have treated virtually identical language as clearly establishing an indemnity period that runs concurrently with an interruption due to an insured peril and lasts until the damaged property is restored. *See, e.g., Western Am., Inc. v. Aetna Casualty & Sur. Co.,* 915 F.2d 1181, 1183–84 (8th Cir. 1990) (indemnity clause stating "for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed commencing with the date of such damage or destruction and not limited with the date of expiration of this policy"); *Beautytuft, Inc. v. Factory Ins. Ass'n,* 431 F.2d 1122, 1124–25

(6th Cir.1970) (virtually identical indemnity clause); *Northwestern States Portland Cement Co.,* 360 F.2d at 534 (same); *Rogers,* 338 F.2d at 242–43 (same); *Metalmasters of Minneapolis, Inc. v. Liberty Mut. Ins.,* 461 N.W.2d 496, 499–500 (Minn.Ct. App.1990) (same). *See also* 15A COUCH, CYCLOPEDIA OF INSURANCE LAW § 57:31 (2d ed.1983) (explaining that "[a] business interruption policy ordinarily limits the recovery to actual loss *for such length of time* as it would take to repair or replace the damaged property") (emphasis added).

If Remington intended its negotiations with INA to produce a business interruption policy with an indemnity period distinct from that of a "standard" business interruption policy, the final product should have included clear language evincing as much. Further, it should not be necessary to eviscerate other express conditions of the policy in order give the indemnity period its alleged "unique" meaning. This is especially true in a situation such as is presented in this case: the insurance was purchased by a sophisticated insured and negotiated by professionals. The principles that guide our determination of whether the policy is ambiguous will not allow us to adjudge reasonable an alternative interpretation of the language of the indemnity period when that interpretation both eviscerates the resumption of operations clause, an express condition of insurance under the policy, and eliminates any time limit for bringing a loss under the policy.

Finally, the construction of the indemnity period advanced by INA is consistent with the purpose of business interruption insurance: to return to the insured that amount of profit that would have been earned during the period of interruption had a casualty not occurred. *See Associated Photographers, Inc. v. Aetna Casualty & Sur. Co.,* 677 F.2d 1251, 1253 (8th Cir.1982); *Eastern Associated Coal Corp. v. Aetna Casualty & Sur. Co.,* 632 F.2d 1068, 1076 (3d Cir. 1980), *cert. denied,* 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 843 (1981); *National Union Fire Ins. Co. v. Anderson–Prichard Oil Corp.,* 141 F.2d 443, 445 (10th Cir.

1944). This type of policy is not designed to compensate for losses sustained beyond the period of restoration. *Rogers,* 338 F.2d at 243–44.

Thus we can discern no objective indicia that the parties intended the policy's indemnity period to be interpreted as Remington suggests. The language of the policy is clear. It informed both the insured and the insurer of the type of business interruption covered: an interruption caused by an insured peril that damages a contributing property which produces the product that the insured ultimately will sell. The policy does not simplistically equate this interruption of business with just an interruption of production or just an interruption of sales. Instead, whether there is a covered loss depends upon the circumstances in which the business finds itself at the time when the interruption occurs: whether sales are lost during the period of interruption is directly related to the level of the insured's inventory and the length of the interruption. We therefore conclude that the alternative indemnity period interpretation advocated by Remington is not reasonable and that consequently the policy is not ambiguous.

We turn then to the question of whether the losses claimed by Remington fall within the scope of the clear language of the policy. Our function is to enforce an unambiguous contract as it is written. *Kampf,* 33 N.J. at 43, 161 A.2d at 720. *See also James v. Federal Ins. Co.,* 5 N.J. 21, 24, 73 A.2d 720, 721 (1950) ("[w]hen a contract is clear the court is bound to enforce the contract as it finds it"). "The law will not make a better contract for the parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the other." *Federal Ins. Co.,* 5 N.J. at 24, 73 A.2d at 721. *See also Steiker v. Philadelphia Nat'l Ins. Co.,* 7 N.J. 159, 166, 81 A.2d 10, 13 (1951); *Caruso,* 136 N.J.L. 597, 57 A.2d at 361.

Remington claims a loss of sales for any three-month period between May, 1981, and June, 1982. In Remington's view, it could have sold the 14,900 typewriters that were not produced because of the earthquakes at any point during that period. Under the clear terms of policy as we have demonstrated above, however, Remington can only recover for losses of sales that occur simultaneously with the interruption of production caused by the earthquakes. As a matter of law, therefore, Remington is not able to recover the losses it claims under its business interruption insurance policy. INA's motion for summary judgment should have been granted.

### III.

For the foregoing reasons, the order of the district court denying INA's motion for summary judgment will be reversed, and both the jury verdict in favor of Remington and the district court's order awarding Remington a total judgment of $1,980,430 will be vacated. Each party will bear its own costs.

### SUR PETITION FOR REHEARING

The petition for rehearing filed by appellants in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all other available circuit judges of the circuit in regular, active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court *in banc,* the petition for rehearing is hereby denied.